UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

------------------------------)
                              )
ACTIVEVIDEO NETWORKS, INC,     )
                              )
                 Plaintiff,   )
                              )
     v.                       )   No. C 13-1980 EMC
                              )
TRANS VIDEO ELECTRONICS, LTD., )
                              )
                 Defendant.   )  San Francisco, California
                              )  Thursday, September 5, 2013
------------------------------)    (32 pages)


TRANSCRIPT OF PROCEEDINGS

**APPEARANCES:**

For Plaintiffs:          Morgan, Lewis & Bockius, LLP
                         2 Palo Alto Square
                         3000 El Camino Real
                         Suite 700
                         Palo Alto, California 94306
                     BY: DANIEL JOHNSON JR.
                         RACHEL CHAN

For Defendant:           Heninger, Garrison, Davis, LLC
                         9800 D Topanga Canyon Boulevard
                         Number 347
                         Chatsworth, California 91311
                     BY: STEVEN WHITEFIELD RITCHESON

Thursday, September 5, 2013

(1:42 p.m.)

(In open court)

**DEPUTY CLERK:**  Calling Case C 13-1980, Activevideo vs. Trans Video.

Counsel, please come to the podium and state your name for the record.

**MR. RITCHESON:**  Steven Ritcheson, specially appearing for Trans Video Electronics.

**THE COURT:**  All right.

**MR. JOHNSON:**  Daniel Johnson Jr. appearing for Activevideo, your Honor.  With me is Rachel Chan.

**THE COURT:**  Thank you, Mr. Johnson.

Okay.  First question is:  Putting aside the covenant not to sue, whether there is sufficient threat here to infer Article III jurisdiction, because that creates a controversy. And, you know, I mean, it seems to be an infinite number of variables that one could put on the scale and create a huge matrix on this question.  But at the end of the day, it seems to me that the message is pretty clear here, in that the letter of April 11th states Active requires a license under the '936 and AO-1, and that Trans Video cannot permit infringement of its patents to continue, thereby pretty clearly sending the message, I believe, that there's been an infringement.

And to hammer home the point that Trans Video has initiated and is currently litigating multiple patent infringement cases asserting these very same patents against numerous video content distributors, etc., etc.

And we have interlicensing agreements. And then sent in copies of the patents and histories and asking for a response within 30 days.

It is true that it doesn't say, "or else we will sue". Doesn't exactly say that. And it is true there's not a history of prolonged discussions between the parties. And yet, it seems to me that the implication of doing nothing is fairly evident.

So, it seems to me there's jurisdiction.

**MR. RITCHESON:** Your Honor, Steven Ritcheson. May I speak?

**THE COURT:** Yep.

**MR. RITCHESON:** If it's all right, may I refer to my client as TVE? I think it will be easier on everybody.

**THE COURT:** Sure, yep.

**MR. RITCHESON:** I agree that the first question is whether as an initial matter Article III jurisdiction can be had at all, so I do agree with that approach.

I don't agree with your initial reading that Article III jurisdiction is vested in this case. The sum and substance of our position is that not every disagreement requires

litigation; that it should be the exception and not the rule. Because we have an opinion does not mean that we need a judge or a jury to become involved in a business discussion.

And that's what we have here. We simply have a disagreement. Our position is that they -- that a license is required. That was the analysis that was conducted from the very high level. There was an invitation to speak further. There was a statement of fact that would have been readily apparent by the plaintiff, that these patents had been litigated previously. The disclosure of that fact, however, I do not agree is a threat. It is a fact that should be considered within the context of a business discussion. And the suggestion that merely because we have a disagreement as to whether a license is required necessarily means that a litigation -- that a lawsuit and the consumption of judicial and party resources should be undertaken, that doesn't follow. Whenever a license is offered in a business dialogue, there will be the position of one party, the patent holder, that the other party should take a license. The fact that that term is called infringement isn't pejorative in any way, it isn't threatening in any way, that's what the law calls it. The fact that there has been a history of litigation that would have been discovered in due diligence is not a threat that requires litigation. It's a statement of fact.

THE COURT: So what more would be required before you

would concede the line has been crossed?  What's required?

**MR. RITCHESON:**  I believe there needs to be an "or else".  I mean, your Honor said it.

**THE COURT:**  It hasn't been explicit, or else.

**MR. RITCHESON:**  Your Honor, until that point at which we know from a single letter that litigation must follow from the perspective of the author, until you can know from a single letter, yes, our position is, if you were relying on a single letter for Article III jurisdiction, it needs to be absolutely clear.  Because you have --

**THE COURT:**  What about *Association for Molecular Pathology*, federal circuit, demanding a royalty under its patents?  The recipient was aware that by asserting rights and other parties by infringement suits by -- I don't believe, unless I'm mistaken, that there was an actual threat that you don't come to the table in 15 days, I'm going to sue you.

**MR. RITCHESON:**  Your Honor, in that case, I believe that there were -- that were additional facts that supported the conclusion that overcomes the presumption against federal jurisdiction.  What we have in this case is no demand for a royalty payment.  What is made is an overture to a small player in the industry with respect to intellectual property owned by a practicing entity, that is, TVE, seeking a dialogue requesting a response within 30 days, if possible.  Requesting a meeting, if it was desired.  This is far and away from the

types of threats that we see that creates a real and immediate injury sufficient to overcome the presumption against federal jurisdiction.

**THE COURT:**  It still doesn't answer my question. Besides *Molecular Pathology*, you've got the 3M case, the Aviary case.  There was even -- the assertion by patent holder was that this particular product, quote, "may infringe" and, quote, "licenses are available".  That's even more sort of conditional.  And they did offer to provide claim charts that adds credence to it.

But again, it wasn't that, You do infringe, and we will sue you if you don't sign a license agreement.  That was enough.

**MR. RITCHESON:**  I understand, your Honor.  I believe that the type of facts that you're looking to shows a preparedness for litigation that is absent from the letter in our case.

**THE COURT:**  Well, it's pretty prepared when they say we're currently litigating multiple patent infringement actions for the very same patents against the distributors, network back-end suppliers, other companies that routinely use networks for distribution of video contents in the course of doing business.

**MR. RITCHESON:**  A statement of fact, however, that is again discoverable and due diligence and relevant to the

dialogue, I think is a far -- a step away from what we're speaking about with respect to -- for example, claim charts, which is that step towards litigation.  That acknowledgment of preparation for litigation.  That is simply absent in our case.

And again, the fact that the word "infringement" is used seems to be causing some anxiety, perhaps, but really, it is only a term that is used to describe the conduct of another party who is using an invention owned by another.  The world calls it infringement.  Not within the context solely of litigation, but within the context of patent law.

So there is nothing inherently pregnant in the term "infringement" that would lead to the belief that a real and imminent threat, an immediate threat of litigation, that is, injury, existed.  And absent that real and immediate threat, which certainly is not at all supported by the final paragraph, this court simply does not have jurisdiction over this matter.

**THE COURT:**  All right.  Your comment, Mr. Johnson?

**MR. JOHNSON:**  Yeah.  Briefly, your Honor.  The test has been articulated repeatedly.  This sounds like an argument that should have been had 15 years ago.  *ABB v. Cooper* articulates the standard very clearly:  "Conduct that can be reasonably inferred as demonstrating intent to enforce a patent can create declaratory judgment jurisdiction."  And

that's what we have here.

The Court goes on to say it is implausible to expect that a competent lawyer drafting such correspondence for a patent owner would, I quote, "identify specific claims, present claim charts, and explicitly allege infringement," and that the specific threat by the patentee is not required to establish jurisdiction.

And the DJ action cannot be defeated simply by the stratagem of correspondence of magic words such as "litigation" or "infringement".

In this case, we have both magic words and a clear threat. I don't think this is even a clear case, your Honor.

MR. RITCHESON:  Your Honor, Steven Ritcheson again. I don't think it's a clear case, either.  I don't think there's jurisdiction here at all.  The facts that Mr. Johnson identified in support of his articulation of the rule simply aren't present in this case with respect to what he pooh-poohed as the magic word of infringement.  But simply saying "infringement" is not the magic word that gets one into federal court and requires crowded dockets in the Northern District of California to consume judicial resources merely because Mr. Johnson finds that the magic words are offensive.

MR. JOHNSON:  I didn't use the word "offensive", your Honor.  I quoted you the statement made by the federal circuit.

I would say, however -- and I've read a few of these letters both ways -- that anyone who tells you that we sued lots of people, and that you've infringed, cannot be heard to say that they were particularly concerned with the Court congestion and that my client had no reason to fear.

I would add nothing further.

**THE COURT:** All right. Well, let's go on to the question about the effect of the covenant not to sue. And -- which could remove jurisdiction if it did exist, or it does exist, if it sufficiently removes a controversy. And one of the major issues here -- there are some other issues about the scope, whether it's sufficient or not. But the question about customers -- and not including within scope of that covenant not to sue, a promise not to sue the customers.

So the first very simple question is: Why not include customers?

**MR. RITCHESON:** Well, there's a variety of issues, your Honor. Some having to do with issues outside of this motion. If I can elaborate just a little bit. We -- instead of getting a response from Activevideo, we were sued. I reached out personally to one of Mr. Johnson's colleagues and asked for a face-to-face meeting between principals, and that the complaint be held in abeyance until we had a chance to speak. Mr. Bregman assured me that he would get back to me, and certainly he did, by serving the complaint and ignoring

our request for a face-to-face meeting.

We then have the situation where we brought the instant motion.  We believe that -- and believe that we complied with the guidance provided by this district with respect to covenant from the *Crossbow* case.  And we were then approached by Mr. Bregman again, requesting changes to the covenant.  These changes included, for example, matters that were not at all relevant to this case, including rights to future patents that may be acquired by TVE.  In light of the relationship that we had established with Morgan, Lewis, we were not willing to participate in a parsing of the language that we believe satisfied this Court's guidance, and we informed them of that fact.

So we are not at this point willing to adjust it, primarily before coming in here, because it would have set a new -- my kids would call it the "new normal", which is the new baseline from which we have to discuss.  And rather than do that, we believe that, for several reasons, that the covenant provided with the guidance of *Crossbow* is sufficient, and that any residue of hypothetical liability that may exist in terms of the customers, in terms of the peculiar components argument, and in terms of the use issue, once analyzed -- which hasn't been done yet by plaintiff -- once analyzed, again through the lens of Article III:  Is it still sufficient to create a real and immediate threat of injury?  There simply

isn't any showing that any hypothetical residual or residue of liability is sufficient to maintain jurisdiction.

**THE COURT:** Have you all had a meet and confer after the -- after Activevideo's response to the proposed covenant?

**MR. JOHNSON:** Yes, we did. I'll speak when the Court's ready. We saw the covenant. We pointed out that the case that they were relying on related to an engineer who had been working on technology, whereas we're in a completely different situation. We were actually using our technology, as were customers of ours. We pointed out 35 USC 271(a) says you can be held liable if you make use, offer to sell or sell.

And we also pointed out that we provided services that were related to this technology into our platform, which was CloudTV H5. They said they were unwilling to change. And we pointed out very clearly that, Look, if you want a covenant not to sue, the way it works is you've got to make sure you're in a position where you're not going to sue us, if you don't want to sue us on these patents.

They wanted to argue about future. We said, Look, we'll take the future off the table. Just the present patents. You're not going to sue us for using our own technology or providing services in that regard. And they said, No. Then they said, Well, but look at *Crossbow*. I said, Well, *Crossbow*'s not applicable because it didn't address the issue that's in front of us.

And that's why we're here today, your Honor.  If they give us a covenant that we can use our technology and provide the services, we're more than happy to walk away.  If they're not, we are no better off than we were before they filed their paper.

THE COURT:  All right.  Here's what we're going to do.  Let me give you my take, and I'll order you to meet and confer to see if you can work something out.  You've already conceded, counsel, that the -- any future patents, we're not talking about that, and that's beyond the scope.

MR. JOHNSON:  Correct.

THE COURT:  Seems to me use is something that's live. As is the question of the platform and services, the product and the services.

On the other hand, a scope that includes any current or active -- any current or prior Activevideo product or service, the only thing at issue here seems to be CloudTV H5 platform and its components, also seems to be broader than what is at issue here.

MR. JOHNSON:  I'm not sure if that's right.  To the extent that say CloudTV was labeled as something prior, anything up to and including the date of the lawsuit that existed would be appropriate.

THE COURT:  All right.  It's the same product but a different name.  I understand that.

**MR. JOHNSON:**  Right.  But we're not talking about using those patents and saying, Oh, you've got a different piece of technology.  So it would have to include our prior technologies, to the extent that they assert infringement.

**MR. RITCHESON:**  Your Honor, this is the sort of thing that we're talking about.

**MR. JOHNSON:**  It's not --

**MR. RITCHESON:**  We're going from a very simple directive, which is the accused products services, and we're now morphing into, Well, it's got components that we used in other stuff, so it's got to cover these other things, even though they're not accused.  And this is the sort of issue we've had resolving this.

**MR. JOHNSON:**  That's not what I said, and that's not --

**MR. RITCHESON:**  I apologize.

**THE COURT:**  It's not that complicated.  We're talking about what the letter is about, which is the CloudTV H5 product and affiliated services.  And to the extent that there is the same -- essentially the same product with a different name and a different generation that might be swept up in here, that may be a fair point of discussion.  But not just anything that's related.  I mean, it's about this particular product.

My inclination is that there's a covenant not to sue, but

all the other things I've talked about -- including customers, which I'll mention in a moment.  Then I think there is a very thin reed.  There's not even a threat.  The letter only addresses this product and services.

MR. JOHNSON:  I understand that.

THE COURT:  That's why I say that.

MR. JOHNSON:  Correct.

THE COURT:  On the other hand, on the customer, it seemed to me, seemed to be the major issue, the -- Activevideo has produced a declaration and at least one example of a contract, licensing and service agreement, that has an indemnification clause, and Mr. Sereda also represents that the, one, Activevideo has entered into agreements, plural, with its customers which would provide further indemnification; and, in Paragraph 6, said, In the past, its agreements with its customers -- in its agreements with its customers, Activevideo often indemnifies its customers for claims of patent infringement in response to indemnification demands.  And so it suggests this is not just a one-off.

Sure, it could be clearer.  It could say that "in most cases", or, "it's typical" -- this is a typical term that's used.  Doesn't quite say that.  But it seems to me it is sufficient to put into play, and I have read the case that was just submitted to me coming out of the federal circuit a few days ago, and I don't think it's dispositive here, for a

number of reasons.

Number 1, the -- Cisco's counsel conceded that its products were not indemnified in the claims charts.  And that TR Labs' counsel conceded that its client had no basis for suing Cisco.  And later conceded that there was substantial noninfringing uses for Cisco's products, and there was no basis for indirect liability.  And, perhaps most importantly, it says, Unlike in Arris, Cisco has never asserted that it has indemnity obligations or any liability its customers might incur.  Indeed, when asked about indemnification agreements in oral arguments, Cisco counsel could not point to any such agreement, promise or obligation.

And here, there is -- you may not think that's enough.  It's not typical.  It's not stated that it's done all the time or typical.  But it's certainly implied or inferred it's not a one-off situation.

**MR. RITCHESON:**  If I could be heard on this.  This really is probably the lynchpin opinion.  The use issue -- this is it.  So we're moving -- basing federal jurisdiction on an unthreatened conduct, that is, there has been no threat against a single customer, is absolutely unheard of.  There is no threat that has been identified to a single customer.  Most importantly, in many ways, the indemnity obligation that you're referring to, if we were to do this in the Socratic method, I would ask you and you would have to respond.  You

don't know what that covers.  You don't know if that indemnity obligation survives installation of this product into another system, that is, a combination.  You don't know if there's a combinational exclusion or not.  You don't know if these products that were sold to a single Japanese company were sold within the United States and therefore implicates U.S. law. You have no facts that you've been provided with by plaintiff to come to the conclusion that there is a valid and existing and relevant indemnity obligation that is sufficient to overcome the presumption against federal court jurisdiction. There simply are no facts.  These untested assertions simply do not provide the facts that are required here.

And again, if you put the customer issue back into the analysis, looking again through the lens of a sufficient, immediate and actual threat, you'll find that it doesn't exist.  You can't simply point at the residue of potential, hypothetical liabilities.  That's what this is.  There's no threat.  We're hypothesizing.  We're saying, There could be a threat.  That type of hypothetical threat simply is not strong enough a foundation upon which to base federal court jurisdiction.

**MR. JOHNSON:**  If I might, your Honor.

**THE COURT:**  Yes.

**MR. JOHNSON:**  We've explicitly pointed to just an exemplar of our indemnification obligation.  Counsel's big on

pointing out that if he'd done any investigation, he would have found others.  I will tell you that I tried the ActiveVideo vs. Verizon, and Activevideo sued our customer cable division in the ITC, and that we provided full indemnification, and that was less than two years ago.  I didn't bother to put it in a declaration because I didn't think it mattered.  But if the assertion is that we haven't identified, or we need to identify more, we can give you as many as you'd like.

I don't think it's necessary.  I don't think the law requires it.  The fact of the matter is:  We sell a system. That system is -- has been accused, and unless he wants -- if he wants to Super Sack it, as I call it, if he wants to Super Sack it, there's a way to do it.  He can exclude our customers, he can include use, and we're done.  He can happily go on his way.

THE COURT:  What about the fact that there's not been any explicit threat to sue customers?

MR. JOHNSON:  There hasn't been.  The reality is, once you sue my system, you have threatened everybody who has the system.  We can't pull our system out.  It is a platform. That platform is deployed in the United States, it's deployed in Asia, and it's deployed in England and Germany.  But he's the one who came forward and said, We'll give you a covenant. Give us the covenant that Super Sack requires, and we're more

than happy to stand down.

**MR. RITCHESON:**  Your Honor, this is --

**THE COURT:**  Before you go there, let me ask:  Do you have any evidence that in the, quote, litigating multiple patent infringement cases asserting these two patents, that they have sued customers in other contexts?

**MR. JOHNSON:**  I do not know.  I know they sued Sony and they lost.  And I know that went up to the federal circuit.  Sony has -- had a different platform.  But they had made threats against cable companies, and we represent a number of cable companies.  I can't tell you they've identified one of ours yet.

But, given their history, there's no question but that that is imminent.  And when that happens, we're in the middle of it.

**MR. RITCHESON:**  Your Honor, there simply is no legal basis to presume jurisdiction in the manner that Mr. Johnson just did.

**MR. JOHNSON:**  It's not a jurisdictional issue.

**THE COURT:**  One at a time.

**MR. JOHNSON:**  I'm sorry.

**MR. RITCHESON:**  That ultimately what we're asked to decide is whether now, at the time of the filing of the complaint, there existed jurisdiction.  That's the test.  Not whether, hypothetically, counsel thinks there may be a chance,

they sue people, they'll probably hit somebody sometime, we better get them now.  That's not a basis for federal court jurisdiction.

And there certainly is -- your Honor, you have been very fair in this process, as you always are.  And you've provided counsel repeated opportunities to provide the factual support to keep this case here.  It's not there.  The statements of counsel today, for example, are not admissible evidence to -- sufficient to support this claim of jurisdiction.  It is their obligation, it is their responsibility, it is their burden, and they haven't met it.

THE COURT:  Mr. Johnson, can you cite a case where a customer has not been sued but there is a contractual or other duty of indemnification by the primary defendant and the court has found that either there was jurisdiction in the first instance, or that Super Sack does not remove jurisdiction?  Any cases where there's not been a threat of suit and yet the courts -- against the customer, and the court said, still, there's too much of a risk here, or there's enough of a risk to create --

MR. JOHNSON:  The answer to your question, your Honor, is I can't, off the top of my head.  But what I can tell you is that the test is whether or not one can reasonably infer, and in a situation where they've specifically sued your platform and you have provided the Court with a covenant with

your customers that says we will indemnify you, we don't think more is required.  That is to say, we have a contractual obligation to our customers, if they're using our platform.  Since they've sued our platform, it necessarily follows that they've implicated our customers.

THE COURT:  So who are typical customers?  Explain to me how it works.

MR. JOHNSON:  Sure.  Just briefly, your Honor.

For example, Activevideo represents, among others, Cablevision, which has about six million subscribers.  Cablevision is in the northeast.  Activevideo also has agreements with Charter -- I'm kind of going off the top of my head, your Honor -- Vodaphone.

What's the one in Philadelphia?

MR. RITCHESON:  Don't ask me.

THE COURT:  So what does it provide?

MR. JOHNSON:  So here's what happens.  What do they provide?  They provide a platform.  They provide a platform in the Cloud that does the following:

When you look at cable TV, if you have one at home, your Honor, or even if it's a digital satellite, you have -- when you open up, you've got a grid guide.  That grid guide can either be located in your box, on your set, or it can actually come from a set of servers elsewhere called the Cloud.  There's technology, that unfortunately we don't have in

Northern California, where you can actually customize your system to have individual channels, so that you just see certain specific channels, that comes from the Cloud.  There is technology out there that will enable you -- if you are the manufacturer, for example, we have an agreement with some TV manufacturers where they have inserted our -- embedded our technology and they can show their own commercials.  And they can actually have their own channels themselves.  That is called the new Smart TVs you probably may have read about.

All of that comes from the Cloud.  That technology is provided by Activevideo, in the first instance.

So that's what we're talking about.  So, for example, when you say, Well, if you have an obligation to indemnify these customers, what does that mean?  Well, here's a good example. Motorola has our product embedded into their boxes.  So the new Motorola boxes all have Activevideo technology in it. That technology then, once activated, will enable them to access a variety of sources.

Other things that are done, for example, is they have a gaming channel so kids who like to play all day on the TVs and their games, these guys have dedicated gaming channels they can get using this technology.

And the reason it's so innovative has to do with the fact that the issue in the world today is choice.  So they can cut the cable, so to speak, and then choose what they want.  All

of that technology is, in fact, available and it's being provided by my client.

So this is not hypothetical to us.  And he may think we're small, and that's fine, but the issue for me is:  I do not want to find myself in a situation, and my client doesn't want to find itself in a situation, where next week all of a sudden they're now suing, I've got clients, I've got Charter, I've got Cablevision.

**THE COURT:**  Is it the case then that this platform only exists in conjunction with the customer?

**MR. JOHNSON:**  Yes.

**THE COURT:**  There's nothing standalone?

**MR. JOHNSON:**  They don't do standalone.  Well, they may at some point.  But that's not what they're doing now. With their embedded TVs, the customers embed the technology, the customer says what they want in terms of their system, and that's the way it goes.  And so we don't have -- we're not a standalone cable company.  We enable the technology that consumers are seeing rolled out on a regular basis.

**THE COURT:**  So the product is delivered through customers to the end-user.

**MR. JOHNSON:**  That's right.  As an end-user, you don't know who we are.  And you sit there and watch television, you have no idea who we are.

**THE COURT:**  All right.  So this is not a situation --

**MR. RITCHESON:**  Your Honor --

**THE COURT:**  Hold on.  This is not a situation where the company has a product that can be distributed through customers or used by intermediate customers to the end-user, or somebody can go directly to the end-user.  This is a product, at least as it exists now, that's only distributed or usable through a customer.

**MR. JOHNSON:**  Right.  We run a back-end system, effectively.  And we provide for various protocols in the delivery system.

**THE COURT:**  That seems to me -- and I know not one factor is dispositive, but the structure of the industry suggests that the risk of suit is higher in this kind of a structure than it might be in another situation where the market is largely a standalone market.

**MR. RITCHESON:**  Your Honor, I totally disagree.  And in fact, I thought I knew where you were heading, and I was totally wrong.

The issue that you pointed out is this key issue, and that is, they're a component manufacturer into a system that may infringe.  That's a far cry from being a risk of their being found to have infringed when their solution is integrated by a third party into a whole bunch of other stuff.  They've got box manufacturers that work with them, they've got glass guys, they've got electronics guys, they've got the diode guys,

they've got the Activision guys.  There's no reason to believe that any individual subcontractor to Motorola is going to be sued.  So I totally disagree.

I have the same facts you do, but there isn't any -- I haven't heard anybody say, Motorola got sued.  I haven't heard anybody say that any customer has been sued because of their product.

**THE COURT:**  Why couldn't Motorola or a Charter or a Cablevision get sued?  Just because it is a -- it's still --

**MR. RITCHESON:**  They may be able to.  But again, it wouldn't be based solely on their product.  It would be on the fact that they're providing some thing else that includes the glass guy's stuff, and a bunch of other people's stuff.

**THE COURT:**  So there's an obligation issue that makes it slightly more different, is that what you're saying, that the likelihood of suing Motorola is diminished by the fact that you'd have to do an allocation?

**MR. RITCHESON:**  No.  The likelihood of any indemnity obligation is completely eliminated by the fact that their product doesn't infringe until it's brought into a system by somebody else.

**MR. JOHNSON:**  Your Honor, I'm not going to interrupt, but that is not our understanding.  We have a platform, your Honor --

**THE COURT:**  Hold on.

**MR. RITCHESON:**  The key issue here, by far, is that the analysis has to be done at the time of filing.  And there simply are no facts to suggest that, at the time of filing, there was a threat by TVE against a single customer of plaintiffs for the use of plaintiff's identified products and services.  It just -- there is nothing.  There are no facts.  There's no argument.  There's no identification of any specific individual.  We're hypothesizing.  And this hypothetical injury is the very injury that has been rejected time and again by the Supreme Court and every reviewing court since then that I'm aware of.

**MR. JOHNSON:**  My turn.  There's nothing hypothetical.  He identified the CloudTV platform.  He didn't say, Oh, there may be some widgets out here.  He identified the platform.  We provide a platform.  That is not a widget.  That's not a box.  That is a delivery of services and technology to the end-user which the end-user is then free to use.  There's nothing hypothetical about it.

**MR. RITCHESON:**  A single example where a customer was threatened for suit by TVE based on that would go a long way towards resolving this.  There isn't a single one.

**THE COURT:**  So why not expand the covenant to include customers?

**MR. RITCHESON:**  For any number of reasons.  One is we don't know exactly how the systems work.  We reached out as

part of a business discussion, the -- how it's integrated, what it does.

THE COURT:  It's a limited covenant.  It's a covenant not to sue in conjunction with this technology that might be used or embedded by the customers.

MR. RITCHESON:  Your Honor, you're adding language, respectfully, that is not in the covenant, and I would have to look more closely at the specific language.

The language tracks *Crossbow* and clearly indicates what is required in order to divest the Court of jurisdiction, assuming it existed, which is to ensure that any real and not hypothetical, and any actual and not imaginary, threat of injury, that is, litigation, in our example, is presented to the Court, other than as the residue of some hypothetical discussion of potential liability.

But that's all we have.  Is hypothetical.  Could happen. Might happen.  Well, your Honor, hasn't happened.  Didn't happen.  As far as I know, won't ever happen.

THE COURT:  Well, won't ever happen, then there's no real opportunity to --

MR. RITCHESON:  Your Honor, as far as I -- this is my directive, is to explain as clearly as possible that Activevideo has never been a litigation target.  Frankly, they are not a company that has been on TVE's radar in terms of litigation.  They're just not at all in danger.  And that's

what we explained via the covenant.  And again, there simply is nothing left.

THE COURT:  All right.  Here's where we're at.  I find that, putting aside the covenant, that there is sufficient jurisdiction, for the reasons I've already stated.  A covenant may or may not divest this court of jurisdiction.  But I want you to meet and confer to see, in light of the comments and discussion we've had today, to see whether you can come to an agreement in that regard.

If not, then I will have to, I guess, see what the final covenant is that's offered and make a determination whether there's enough there to find Article III jurisdiction as a residuary matter.

I will say that it seems to me, if there's no true intent or plan to sue the customers, and given the, frankly, unclarity in the law in this area, in litigation risks on both sides, if you want to push this to its logical conclusion, makes sense to me to try to work something out.  It is true that right now I'm hard pressed to find cases where there's not a threat of suit against customers which then brings into play whether or not there's an indemnification provision.

On the other hand, given the structure of this industry, it certainly doesn't take much to infer that customers may be at risk here, even though there has not been an express threat at this point.

I will also point out that a refusal to enter into a covenant not to sue or to extend a covenant not to sue and cover, for instance, a customer has been held and was held in this most recent Cisco case, from the federal circuit, not to be determinative of the issue -- that doesn't mean it's not relevant.  That also is one factor in the calculus in determining how real is this threat.  So, for good reason, it's not determinative for the reasons stated, and no reasons that were blocked in the Cisco case.

On the other hand, the Court did not hold that you don't consider them.

So there are a number of factors kind of going both ways on this issue, and I need to tell you right now:  There's a risk, if you want to push it to its logical conclusion as to whether or not offer a covenant without the customers, whether this case stays on or not.

So, I'll direct you to meet and confer now that you've heard some of my thoughts and see if you can work something out.  Report back to me if you can.  And I'd like to know exactly what is the final covenant you are offering.

MR. JOHNSON:  Is there a date by which you'd like a report, your Honor?

THE COURT:  Well, I was going to ask you.  I don't know --

MR. RITCHESON:  Your Honor, are you consistent with

this ordering, the disclosure of the customer list --

**THE COURT:**  No, I'm not ordering anything at this point.

**MR. RITCHESON:**  We need to know who the customers are, if we're going to have this dialogue.  We can't keep being asked to do things in the abstract here.  It's this product, it's that product, it's this customer, it's that customer.  Who are we talking about?

**MR. JOHNSON:**  Your Honor, can we have a date by which --

**THE COURT:**  Obviously, to the extent that this will facilitate things, I'll leave that into your discretion to provide some discovery or some information.  And if you don't provide information and therefore TVE decides not to commit in the way you want, then you, of, course risk what I'm going to rule on this thing.

**MR. JOHNSON:**  I understand.

**THE COURT:**  We have a CMC in two weeks.  On the 9th. Is that enough time for you to meet and confer to work something out?

**MR. JOHNSON:**  Certainly.

**MR. RITCHESON:**  I'm curious if we're going to address the issue of the personal jurisdiction.

**THE COURT:**  I'll tell you right now that I find there is personal jurisdiction.

**MR. RITCHESON:**  Could your Honor inform me whether that would be general or specific jurisdiction?

**THE COURT:**  Specific jurisdiction.  I didn't even think there was an argument on general.

**MR. RITCHESON:**  I didn't even think there was.  With respect to specific jurisdiction, that is arising from the belief that the letter itself was sufficient for TVE to believe that it would be hauled into court here if its business discussions did not --

**THE COURT:**  Well, the letter is part of it.  The fact that there has been some enforcement activity in this district on multiple occasions.  I understand the argument that Lob is now several years old, but the one case, the Sony case, has been on appeal, at least until what, January of this year, and so it remained active, potentially active in this district.  There's been licensing activity.  I understand that the Apple license maybe shouldn't count for much since that arose out of a lawsuit brought in the District of Columbia, but the DirecTV licensing was connected with the lawsuit here in this district, and so I find that there is enough enforcement activity that has occurred that is connected with this forum sufficient to satisfy due process, so that's the gist of what I find, in that regard.

**MR. RITCHESON:**  Will your Honor be issuing a written order on the results of this proceeding, particularly with

respect to jurisdiction?

**THE COURT:** I don't know. I may or I may not. Depends.

**MR. JOHNSON:** All right.

**THE COURT:** You know, I can put that CMC back another week. I'd rather not have you hauled back here and you're still in discussions.

**MR. JOHNSON:** I think the 19th works, your Honor. My schedule gets worse the later we go. I prefer --

**THE COURT:** I want to know in advance where you're at, too, so I need a filing several days in advance, and today's already the 5th.

**MR. RITCHESON:** Your Honor, I'd propose we actually move it back by 30 days so we don't actually have to waste time with the CMC report as well. If we're going to be able to resolve this, we will be able to resolve it within the next two weeks. If not, I think counsel needs some additional time perhaps to consider amending their complaint, things of that nature.

**THE COURT:** I'm move it back to the 26th. That will give you two weeks with all this, and then, you know, a few days to file the CMC statement with me. Let me know what's going on at that point. If it hasn't resolved, I will talk to you then about how we're going to schedule this, reschedule it for further hearing, or I just rule on the papers, on the

jurisdictional question.  And we'll go on from there.

So I will move the CMC to the 26th and ask that you, in your filing on the 19th, you let me know whether you got this resolved or not.

**MR. JOHNSON:**  Will do, your Honor.

**THE COURT:**  Okay.

**MR. RITCHESON:**  What time is that, your Honor?

**DEPUTY CLERK:**  9:00 o'clock.

**MR. RITCHESON:**  9:00 o'clock.

**MR. JOHNSON:**

**THE COURT:**  Thank you.

(Adjourned)

oOo

CERTIFICATE OF REPORTER

I, Connie Kuhl, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing proceedings were reported by me, a certified shorthand reporter, and were thereafter transcribed under my direction into written form.

_____

Connie Kuhl, RMR, CRR
Tuesday, September 17, 2013